M & G ELECTRONICS SALES CORP., Plaintiff,

v.

SONY KABUSHIKI KAISHA also trading as Sony Corporation and Sony Electronics Inc., Defendants.

No. 01CV7668 (ADS)(ETB).

United States District Court, E.D. New York.

Feb. 28, 2003.

Moritt, Hock, Hamroff & Horowitz, LLP by Alan S. Hock, Esq., Neil J. Moritt, Esq., James E. Brandt, Esq., and Terese L. Arenth, Esq., Garden City, NY, for Plaintiff.

Fross, Zelnick, Lehrman & Zissu, P.C. by Richard Z. Lehv, Esq., John P. Margiotta, Esq., Zoe Hilden, Esq., and James D. Weinberger, Esq., New York City, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The plaintiff M & G Electronics Sales Corporation ("M & G") brings this action against the defendants Sony Kabushiki Kaisha, Sony Corporation and Sony Electronics Inc. (collectively, "Sony") alleging trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a). Presently before the Court are objections to a report from United States Magistrate Judge E. Thomas Boyle recommending that the Court deny M & G's motion to preliminarily enjoin Sony from using the mark "MG" or any other mark confusingly similar to M & G's federally registered trademark. This opinion sets forth the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

### I. THE FACTS

#### A. The Parties

##### 1. M & G

The facts are taken from the complaint, the parties' affidavits and the evidentiary hearing. In 1961, Louis Maltz and Edward Greenberg founded M & G. At that time, M & G sold television tubes and semiconductors to service technicians who

used those products to repair radios, televisions and other electronic products. Beginning in 1975, M & G expanded its business. In that regard, M & G hired contractors in the Orient to manufacture speakers and audio products to M & G's specifications. M & G then imported those products and sold them to various distributors. In turn, the distributors sold M & G's products to retail stores who sold the products directly to consumers.

Currently, M & G sells two types of products: (1) finished electronic products for distribution to the consumer market; and (2) electronic products for sale to "original equipment manufacturers" who use them in their electronic products. M & G sells approximately 250 different types of finished electronic products.

Examples of M & G's finished electronic products include: (a) speakers and speaker systems for various audio and video products, including home theater and computer systems; (b) equipment for security systems, including power supplies, sirens, transformers and other closed circuit television products; (c) headphones for audio products, including mobile telephones and personal computers; (d) wireless microphones and public address amplifiers. The finished electronic products are individually packaged and most contain M & G's trademark on the packaging and the product itself. Examples of products sold to original equipment manufacturers include buzzers, small speakers, miniature speakers, switches and transducers. To be more user friendly, those products are packaged in bulk or egg crates so they can be taken out easily and placed into other products.

For the last three years, M & G's annual sales revenue averaged $7,850,000. M & G claims that approximately 75% of its gross sales revenue came from the sale of finished products for distribution to the consumer market. M & G now employs 18 people.

## 2. Sony

Sony manufactures audio, video, communications and information technology products for consumers and professional markets. For fiscal year ending March 31, 2001, Sony had consolidated annual sales of over $60 billion and at that time employed approximately 181,000 people. Currently, Sony sells a wide-array of electronic products, including desktop and notebook computers, radios, televisions, tape recorders, telephone and telecommunications products, stereo equipment, digital cameras, camcorders, CD burners, personal digital assistants and car audio products. All of Sony's electronic products are marketed and sold under the trademark SONY with most of those products sold under an additional trademark, including WALKMAN for its portable radios and tape cassette players; VAIO for its notebook and desktop computers; CLIÉ its personal digital assistants; and HANDYCAM for its camcorders.

## B. The Dispute

### 1. M & G's Trademark

In 1993, M & G registered the trademark, ■■■ (the "MG Mark"). The trademark was for the following goods:

Loud Speakers, Tweeters, and Woofers; Sirens; Electric Switches; Namely, Toggle, Shunt, and Contact Switches; Transducers; Speakers; Attenuators; Siren Boxes with Premounted Speakers; Siren Drivers; Audio Sound Wave Indicators; Compression Drivers; Electromagnetic Buzzers and Ceramic Piezobuzzers; and Alligator Clip Test Leads....

The MG Mark originated from the last names of its founders, Maltz and Greenberg.

## 2. Sony's MEMORY STICK

In 1998, Sony began selling a computer storage card device, marketed under the registered trademark MEMORY STICK. Each MEMORY STICK is less than 1 inch wide, 2 inches long and less than 1/8 inch thick. The MEMORY STICK fits into MEMORY STICK-compatible products, including computers, camcorders, personal digital assistants and WALKMAN products. The MEMORY STICK comes in two formats, one in purple and another in white.

## 3. Sony's MAGIC GATE

On February 25, 1999, Sony announced the development of new copyright management technology for digital music. That new technology prevented unauthorized copying of digital music by limiting a consumer's ability to copy digital music. Sony named this new technology, MAGIC GATE. Sony also developed the OPENMG, a music jukebox software program, which works with the MAGIC GATE technology to prevent unauthorized copying, playback or transmission on a personal computer.

Currently, Sony includes its MAGIC GATE technology on the white MEMORY STICK but not the purple ones. Sony advertises and promotes the white MEMORY STICK as the MAGIC GATE MEMORY STICK. In addition to the trademarks SONY, MEMORY STICK and MAGIC GATE, the white MEMORY STICK packaging and product itself contain the following designation, (the "MG Designation"). Sony also places the MG Designation on those products that are compatible with the MAGIC GATE technology, including VAIO desktops and notebook computers, CLIÉ personal digital assistants and SONY WALKMAN products. Appearing in fine print on those products and their packaging, the MG Designation indicates to the consumer that the product is equipped with the MAGIC GATE technology. All of those products are promoted, advertised and sold under the SONY trademark along with Sony's designated trademark for that particular product, such as CLIÉ, WALKMAN or VAIO.

Sophisticated consumers purchase products containing the MAGIC GATE technology. For example, the typical consumer of the MAGIC GATE MEMORY STICK WALKMAN is a person who is very familiar with PC technology. The typical consumer of the "MG Memory Stick System-up Player" is a person who has a Sony in-dash stereo in her car and is a MEMORY STICK enthusiast.

From the time it began selling products with the MG Designation in February 2000, neither Sony nor its retailers have actively promoted the MG Designation. For instance, Sony does not sell any products branded solely with the MG Designation or the OPENMG and does not have the MG Designation featured prominently on its home page. Sony also does not instruct its retailers to promote the MAGIC GATE feature in Sony's products. Further, Sony's retailers do not advertise the MG Designation in their catalogues and Sunday fliers.

Mark Viken the Senior Vice President of the Information Technology Products Division of Sony Electronics testified at the evidentiary hearing before Judge Boyle that Sony intended to discontinue its use of the MG Designation by early next calendar year. The reason given was that the technology feature was not something desired by consumers and Sony intended to

merge the purple and white MEMORY STICKS into one MEMORY STICK.

### 4. Sony's Trademark Applications

Sony filed the following trademark applications with the United States Patent and Trademark Office (the "PTO"): MEMORY STICK (July 1997); OPENMG (May 1999); and the MG Designation (October 1999). The PTO then granted Sony a trademark for MEMORY STICK (October 1999) and OPENMG (April 2002).

In its trademark application for the MG Designation, Sony sought trademark protection for the following goods:

Storage media for audio/visual/computer data; IC chips; computers; printers; apparatus for recording, transmission or reproduction of sound or images, namely, video cameras, still cameras, televisions, audio tape/disc players/recorders, video tape/disc players/recorders, headphones, earphones, microphones, speakers, radios and telephones . . . .

On April 13, 2000, an examiner for the PTO denied the application on the ground that the MG Designation was similar to the MG Mark and that Sony's identified goods, namely speakers was too closely related to M & G's goods—loud speakers, tweeters and woofers. Because of the similarity between the two marks and the nature of their goods and services, the examiner found that the public was likely to confuse the two marks.

After the PTO's denial, counsel for Sony conducted an investigation of M & G's business. That investigation consisted of: (1) a review of a Dun & Bradstreet report which showed that M & G was a wholesaler of electronic parts; (2) an Internet search which showed third-party usage of the term M & G in the electronics industry; and (3) a telephone call to M & G which revealed that M & G sold electronic parts but not complete audio or electronic

products and sold to businesses, not consumers.

On October 27, 2000, Sony filed an amendment and response to the PTO's denial of its trademark application for the MG Designation. In that application, Sony deleted "speakers" from the identification of goods and identified in greater detail those goods to read as follows:

Storage media for audio/visual/computer data, namely, semi-conductors packed stick-like, blank computer discs and blank audio and video tapes for recording audio, video and computer data; IC chips; computers; computer printers; apparatus for recording, transmission or reproduction of sound or images, namely, video cameras, still cameras, televisions, audio tape/disc players/recorders, video tape/disc players/recorders, headphones, earphones, microphones, radios and telephones . . . .

On November 24, 2000, the same examiner for the PTO denied the application on the grounds noted in the first denial. Currently, Sony's appeal of that denial is pending before the Trademark Trial and Appeal Board (the "TTAB").

### 5. Sony's Consent Request

On July 30, 2001, counsel for Sony mailed a letter to M & G's President Elliot Maltz requesting consent to use the MG Designation. Maltz did not receive that letter. On September 27, 2001, counsel for Sony faxed the July 30, 2001 letter to Maltz. Maltz then referred the letter to M & G's counsel. On October 25, 2001, counsel for M & G contacted counsel for Sony to discuss the two letters sent to Maltz. On November 19, 2001, counsel for M & G sent Sony a cease and desist letter. Thereafter, the parties conducted settlement discussions which terminated unsuccessfully on January 29, 2002.

## C. The Procedural History

On November 16, 2001, M & G filed a complaint against Sony in the Eastern District of New York alleging four separate claims under theories of trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a). On December 26, 2001, M & G filed an amended complaint replacing the defendant Sony Corporation of America with Sony Electronics Inc. and maintained the same facts and claims in the complaint.

On May 2, 2002, M & G filed a motion for a preliminary injunction seeking to prevent Sony from:

> (i) using in commerce the mark "MG" or any other mark confusingly similar to [M & G's] federally registered trademark, MG, registered with the United States Patent and Trademark Office on May 11, 1993 and bearing Registration No. 1769802, in connection with the sale, offering for sale, distribution and advertising of [Sony's] goods or services, including but not limited to, storage media for audio/visual/computer data; IC chips; computers; printers; apparatus for recording, transmission or reproduction of sound or images, namely, video cameras, still cameras, televisions, audio tape/disc player/recorders, video tape/disc players/recorders, headphones, earphones, microphones, speakers, radios and telephones; and (ii) from engaging in any further such acts in violation of [M & G's] rights under the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a).

On May 13, 2002, the Court referred the motion for a preliminary injunction to Judge Boyle to hold an evidentiary hearing and prepare a report and recommendation. On May 21 and 22, 2002, Judge Boyle held an evidentiary hearing and then issued a report recommending denial of the motion on June 4, 2002. In his report, Judge Boyle found that M & G failed to show irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits of the action and a balance of hardships decidedly in its favor.

On June 18, 2002, M & G filed objections to the report and recommendation. In those objections, M & G challenged Judge Boyle's findings of fact and conclusions of law on the following grounds: (1) failure to accord the appropriate weight to the PTO's denial of Sony's application to register the MG Designation; (2) requiring M & G to satisfy a higher standard for injunctive relief; (3) misapplication of the *Polaroid* factors in evaluating the likelihood of confusion between MG's products and Sony's Magic Gate products; (4) failure to find that M & G will be irreparably harmed absent an injunction; (5) failure to find that the balance of hardships tips decidedly in M & G's favor; and (6) finding erroneously that M & G delayed in moving for injunctive relief.

## II. DISCUSSION

### A. The Standard

■ A court is required to make a *de novo* determination as to those portions of the report and recommendation to which objections were made. 28 U.S.C. § 636(b)(1)(C); *Grassia v. Scully*, 892 F.2d 16, 19 (2d Cir.1989). The phrase "*de novo* determination" in Section 636(b)(1)—as opposed to "*de novo* hearing"—was selected by Congress "to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations." *United States v. Raddatz*, 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Section 636 does not require a court "to rehear the contested testimony in order to carry out the statu-

tory command to make the required 'determination.'" *Id.* at 674, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424. Rather, in making such a determination, a court may in its discretion review the record and hear oral argument on the matter. *See Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir. 1990). Furthermore, a court may in its sound discretion afford a degree of deference to the magistrate's report and recommendation. *See Raddatz,* 447 U.S. at 676, 100 S.Ct. 2406, 65 L.Ed.2d 424. In light of these principles, the Court makes a *de novo* determination with regard to the specific objections raised by M & G.

### 1. The First Objection—The PTO Denials

M & G objects to Judge Boyle's report on the ground that he did not give great weight to the PTO's decisions denying Sony's application to register the MG Designation. The Court finds that this objection has merit.

■ Where, as here, the PTO has declined to register a defendant's mark because of the plaintiff's registration, that refusal "is entitled to great weight" on the issue of likelihood of confusion in a later trademark action. *Syntex Labs., Inc. v. Norwich Pharmacal Co.,* 437 F.2d 566, 569 (2d Cir.1971). Since *Syntex,* the Second Circuit has reaffirmed this rule. *Murphy Door Bed Co., Inc. v. Interior Sleep Sys., Inc.,* 874 F.2d 95, 101 (2d Cir.1989) ("[T]he decision of the PTO, and certainly the TTAB, is to be accorded great weight.") (citing *Syntex,* 437 F.2d at 569).

District courts within this circuit have recognized the great deference owed to the PTO's decisions. *See Cullman Ventures, Inc. v. Columbian Art Works, Inc.,* 717 F.Supp. 96, 120 (S.D.N.Y.1989) (stating that "decision by the PTO is entitled to great weight."), *disagreed with on other* grounds, *Car–Freshner Corp. v. S.C. Johnson & Son, Inc.,* 70 F.3d 267, 269 n. 1 (2d Cir.1995); *Gucci v. Gucci Shops, Inc.,* 688 F.Supp. 916, 927 (S.D.N.Y.1988) (stating that the PTO's refusal is entitled to substantial weigh) (citing *Syntex,* 437 F.2d at 569).

The leading treatise on trademarks and unfair competition also recognizes that courts in the Second Circuit must give great weight to the PTO's refusal to register a defendant's mark because of the plaintiff's registration. 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:84 (4th ed. 2002) ("McCarthy") ("The Second Circuit Court of Appeals has stated that while the Patent and Trademark Office's refusal to register defendant's mark because of plaintiff's registration is not conclusive, it is entitled to great weight.") (citing *Syntex,* 437 F.2d at 569).

Here, Judge Boyle did not give great weight to the decisions of the PTO. Rather, he noted that he reviewed the PTO's decisions and then conducted an independent analysis of the *Polaroid* factors to determine a likelihood of confusion between M & G's products and Sony's Magic Gate products. In support of his decision not to give great weight to the PTO's decisions, Judge Boyle relied on *Goya Foods, Inc. v. Tropicana Products, Inc.,* 846 F.2d 848 (2d Cir.1988) for the principle that the PTO uses different standards, when deciding whether or not to grant a trademark application, than courts in trademark infringement actions. R & R at 14. In addition, he relied on language in *Goya* which states that a district court must conduct an independent analysis of likelihood of confusion. *Id.*

*Goya* involved the "issue whether a district court may stay trademark infringement litigation pending the outcome of

registration proceedings before the Trademark Trial and Appeal Board of the United States Patent and Trademark Office." *Goya*, 846 F.2d at 849. There, the Second Circuit held that the pendency of the registration proceeding was not a proper basis to stay the trademark infringement litigation. *Id.* at 854. In analyzing the issue presented, the Second Circuit noted that, irrespective of the outcome of the PTO's registration proceeding, the district court must independently evaluate, among other things, the likelihood of confusion under the *Polaroid* factors. *Id.* *Goya* did not challenge, vacate or alter the rule in this circuit that the PTO's refusal to register a defendant's mark because of the plaintiff's registration is entitled to great weight.

Sony sets forth a number of arguments why the Court should not give great weight to the PTO's decisions: (1) courts routinely decline to defer to the PTO's decisions; (2) the PTO uses a different standard in assessing likelihood of confusion and does not have the great mass of evidence that a district court has before it; (3) the PTO's decision was made at the lowest administrative level of the PTO, a single staff attorney; (4) even though the Second Circuit gave great weight to the PTO's decision in *Syntex*, it conducted its own thorough review of the evidence; and (5) the PTO did not conduct a "reverse confusion" analysis which involves the claim that consumers are likely to assume mistakenly that Sony is the source of M & G's goods. Each of these arguments is unpersuasive.

First, there is no support for Sony's argument that courts routinely decline to defer to the PTO's decisions. To the contrary, courts within this circuit must give great weight to the decisions of the PTO. *See Murphy Door*, 874 F.2d at 101; *Syntex*, 437 F.2d at 569; *Cullman Ventures*,

717 F.Supp. at 120; *Gucci*, 688 F.Supp. at 927.

Second, Sony relies on case law in the Ninth Circuit, *Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794 (9th Cir.1970), to support its argument that the PTO uses different standards than courts in assessing likelihood of confusion and does not have the mass of evidence that the district court has before it. As an initial matter, *Carter–Wallace* does not state that the PTO uses different standards than courts. *See* 434 F.2d at 802. In addition, the Second Circuit has had opportunities to adopt the reasoning in *Carter–Wallace* but has chosen not to do so. *See Murphy Door*, 874 F.2d at 101; *Syntex*, 437 F.2d at 569. *See also A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 220–221 (3d Cir.2000) (noting the conflict between the Second Circuit's rule—the PTO's refusal to register a mark is entitled to great weight—and the Ninth Circuit's rule-the PTO's refusal is entitle to consideration but not great weight).

Third, Sony relies again on *Carter–Wallace* for the argument that the PTO's decisions should not be given great weigh because they were made by a single staff attorney. As noted above, the Ninth Circuit and the Second Circuit differ on the proper deference due the PTO's decisions. Fourth, Sony's argument that even though the Second Circuit gave great weight to the PTO's decision in *Syntex*, it conducted its own thorough review of the evidence is irrelevant. This argument does not change the rule that courts must give great weight to the PTO's decisions.

Finally, Sony's argument that the PTO did not conduct a "reverse confusion" analysis and thus there is no PTO determination on "reverse confusion" to which this Court can give any weight, is without merit. As an initial matter, Sony cites no

support for this argument. Further, the Second Circuit has never stated that the theory upon which the PTO bases its refusal controls. *See Syntex*, 437 F.2d at 569. The Second Circuit has stated that the PTO's refusal to register a defendant's mark based on the plaintiff's mark is evidence of a likelihood of confusion in a later trademark action. *See id.* Furthermore, "reverse confusion" and ordinary confusion apply the same test, namely the *Polaroid* factors, to determine a likelihood of confusion. *See Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 491 (2d Cir. 1988) (applying the *Polaroid* factors to decide likelihood of confusion in a "reverse confusion" case).

Accordingly, the Court sustains M & G's first objection and finds that the PTO's decisions, denying Sony's application for the MG Designation because of the MG Mark, are entitled to great weight on the issue of likelihood of confusion.

### 2. The Second Objection—A Higher Standard

■ M & G objects to Judge Boyle's report on the ground that he required M & G to satisfy a higher standard for injunctive relief. The Court finds this objection is without merit. In the first instance, Judge Boyle correctly noted that a party seeking a preliminary injunction must show: (1) irreparable harm absent the injunction; and (2) either (a) likelihood of ultimate success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the moving party. See *Random House, Inc. v. Rosetta Books, LLC*, 283 F.3d 490, 491 (2d Cir.2002) (*per curiam* ).

■ Judge Boyle also correctly required M & G to make either a clear showing that it was entitled to the relief requested or show that serious damage will result ab-

sent injunctive relief. R & R at 11. The Second Circuit has stated that the movant must satisfy a higher standard where the requested injunction: (1) will alter, rather than maintain the status quo, or (2) will provide the movant with substantially all the relief she seeks and that relief cannot be undone if the nonmovant prevails at a trial on the merits. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.* 60 F.3d 27, 33–34 (2d Cir.1995). Where the higher standard applies, the movant must make a "clear showing that [she] is entitled to the relief requested, or where extreme or very serious damage will result from denial of preliminary relief." *Id.* at 34 (internal quotation marks and citation omitted).

Here, the higher standard is required because injunctive relief will alter the status quo by forcing Sony to stop using the MG Designation, force Sony to recall all products with that designation and will provide substantially the same relief to M & G that would be awarded after trial. *See Left Bank Co. v. Elliman–Gibbons & Ives, Inc.*, No. 99–11251, 1999 WL 1114745, *1 (S.D.N.Y. Dec. 7, 1999) (applying the higher standard where the injunction will force defendants to stop using the term "The Left Bank" and will provide plaintiff with substantially all relief sought); *Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F.Supp.2d 271, 276 (S.D.N.Y. 1998) (applying the higher standard where the injunction will force defendant to stop using the word "Lexington" and will grant in many respects the same relief awarded after trial). Accordingly, the Court finds that Judge Boyle correctly required M & G to satisfy the higher standard for injunctive relief.

### 3. The Third Objection—Misapplication of the *Polaroid* Factors

■ M & G objects to Judge Boyle's report on the ground that he misapplied

the *Polaroid* factors in evaluating the likelihood of confusion between M & G's products and Sony's Magic Gate products. In particular, M & G challenges Judge's Boyle's finding on each of the eight *Polaroid* factors. The Court will first set forth the *Polaroid* factors and then address M & G's objections with regard to each factor.

█ Where, as here, the plaintiff alleges reverse confusion between its products and the defendant's products, the court assesses the likelihood of confusion under the factors set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961). *Banff*, 841 F.2d at 490–491. The *Polaroid* factors include: (1) strength of the plaintiff's mark; (2) similarity of the marks; (3) proximity of the goods or services; (4) likelihood of bridging the gap; (5) quality of the products; (6) buyer's sophistication; (7) actual confusion; and (8) the defendant's good faith in adopting the mark. *Id.* at 489. No one factor is dispositive. *Id.* at 490.

### a. The Strength of the MG Mark

Judge Boyle found that this factor favors Sony. M & G argues that Judge Boyle incorrectly: (1) did not find that the MG Mark was "fanciful"; (2) imposed what amounted to a *de facto* "secondary meaning" requirement; and (3) found that the MG Mark had been weakened by extensive third-party usage of the term MG in the electronics industry. The Court finds that M & G's first argument has merit but the other two contentions do not.

█ A mark's strength refers to its " 'tendency to identify the goods sold under the mark as emanating from a particular, although possible anonymous source.' " *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir.1995) (quoting *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979)). That strength depends on two factors: (1) its inherent distinctiveness; and (2) its degree of distinctiveness in the marketplace. *See Lang v. Ret. Living Pub. Co., Inc.*, 949 F.2d 576, 581 (2d Cir.1991); *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993), *limited on other grounds, Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 46 (2d Cir.1994).

█ The first factor, the inherent distinctiveness of a mark, is categorized in ascending order of strength: (a) generic; (b) descriptive; (c) suggestive; and (d) arbitrary or fanciful. *Gillette Co.*, 984 F.2d at 572. In categorizing the distinctiveness of a trademark, "a court examines the context in which the words constituting the mark are used.... [For example,] the word apple would be arbitrary when used on personal computers, suggestive when used in Apple–A–Day on vitamin tablets, descriptive when used in Tomapple for combination tomato-apple juice and generic when used on apples." *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 583 (2d Cir.1993) (internal quotation marks and citations omitted).

The MG Mark is a made-up term. It originated from the last names of the founders of M & G Electronics, Maltz and Greenberg. It does not refer at all to the electronics industry where the goods bearing the MG Mark are sold. As such, it is an arbitrary or fanciful mark. *See Arrow Fastener*, 59 F.3d at 391 ("An arbitrary mark has an actual dictionary meaning, but that meaning does not describe the product. A fanciful mark is a made-up term."). *See also Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 139 (2d Cir.1999) (categorizing the word "Morningside" as an arbitrary mark in the financial investment community).

█ The second factor, the mark's degree of distinctiveness in the marketplace,

considers the mark's secondary meaning, namely the degree to which consumers recognize the mark as identifying the source of a particular product. *Gillette Co.*, 984 F.2d at 572–573. Indeed, the ultimate strength of a mark "turns on its origin-indicating quality, in the eyes of the purchasing public...." *Lang v. Ret. Living Publ'g Co., Inc.*, 949 F.2d 576, 581 (2d Cir.1991) (internal quotation marks and citations omitted); *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997) (stating that the strength of a mark "ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source.") (citation omitted); *See also Playboy Enters., Inc. v. Chuckleberry Publ'g Co.*, 486 F.Supp. 414, 420 (S.D.N.Y.1980), *aff'd*, 687 F.2d 563 (2d Cir.1982) (stating that a mark may be conceptually strong but at the same time be commercially weak if the mark lacks significance in the market place for purposes of identifying the origin of the goods).

 Extensive third-party usage of a mark in the same industry weighs against a finding that a mark is strong in the market place. *Morningside Group*, 182 F.3d at 139; *Lang*, 949 F.2d at 581; *Lever Bros. Co. v. Am. Bakeries Co.*, 693 F.2d 251, 256 (2d Cir.1982) (stating that the strength of an arbitrary mark may be diluted by third-party use). Here, such third-party usage of MG exists in the electronics industry. For example, the following electronic companies, among others, advertise and do business under the names: MG Electronics & Equipment Company, Inc.; MG Electronics; M & G Battery; MG Technologies; MG–Soft Corporation; MG Corporation; M & G Industries Inc.; and MG Chemicals. Those companies all advertise and use a logo similar to the MG Mark.

Lack of evidence that consumers associate the MG Mark with M & G weighs against finding the MG Mark is strong in the market place. *See Estee Lauder*, 108 F.3d at 1511 (noting lack of evidence that consumers associated the term "100%" or the phrase "100% Time Release Moisturizer" with Lauder weighed against the strength of the marks). Also, the record contains no evidence that M & G has successfully policed its mark in the past. *See Morningside Group*, 182 F.3d at 139 (noting the successful policing of a mark adds to the strength of a mark) (citing *Lexington Mgmt.*, 10 F.Supp.2d at 283). Significantly, the record further reveals that M & G does no consumer advertising, which is unusual considering approximately 75% of its gross sales revenue purportedly comes from the sale of finished products for distribution to the consumer market. *See Lang*, 949 F.2d at 581 (noting the lack of advertising indicates consumers would not associate a mark with a particular product).

Based on the foregoing, the MG Mark's degree of distinctiveness in the market place is weak. Because the ultimate strength of a mark turns on its degree of distinctiveness in the market place, the Court finds that Judge Boyle correctly found that this factor favored Sony.

### b. Similarity of the Marks

Judge Boyle found that this factor favored Sony. M & G argues that Judge Boyle incorrectly: (1) compared the two marks; (2) considered Sony's use of the MG Designation as a product feature; and (3) considered the appearance of Sony's use of house marks on MG designated products.

 In assessing this factor, the court must decide "whether the labels create the 'same overall impression' when viewed separately." *Banff*, 841 F.2d at 492 (quoting

*Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.,* 680 F.2d 891, 893 (2d Cir. 1982)) (quoting *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1060 (2d Cir. 1979)). Judge Boyle cited this test and noted "[f]actors to consider include the context in which the logos are found, the typeface of the two marks, other terms or marks used in conjunction with the logo, and the size and placement of the logos." R & R at 16 (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1078 (2d Cir.1993)). It is helpful at this point to set forth the two marks at issue here:

 The MG Mark

The MG Designation

Viewing each mark separately, the Court finds that it is unlikely that a reasonably prudent purchaser would find the overall image of the products sold or their packaging confusingly similar. First, the marks are used in different contexts. The MG Mark appears conspicuously in broad print on M & G's products and packaging, while the MG Designation appears in fine print on Sony's products and packaging. Second, the typeface and the size of the marks are different. The MG Mark appears in large, bold stylized print with a three-dimensional image, while the MG Designation appears in much smaller block print with a unique stylized "M" over the "MG". Third, the MG Designation appears on Sony's products and packaging with other well-known trademarks exclusively associated with Sony, including SONY, VAIO, CLIÉ and WALKMAN. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1046 (2d Cir.1992) (noting the prominent presence of well known trade names is highly relevant to countering consumer confusion). Accordingly, the Court finds Judge Boyle correctly found that this factor favored Sony.

**c. Proximity of the Goods or Services**

Judge Boyle found that this factor favored Sony. M & G argues that Judge Boyle incorrectly applied the legal standard by (1) comparing the products bearing the MG Mark and the MG Designation instead of comparing Sony's products and M & G's products; and (2) finding that M & G's products and Sony's Magic Gate products are unrelated.

In assessing this factor, the court must decide "whether and to what extent the two products compete with each other." *See Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 480 (2d Cir.1996). Relevant factors include "the nature of the products themselves and the structure of the relevant market. Among the considerations germane to the structure of the market are the class of customers to whom the goods are sold, the manner in which products are advertised, and the channels through which the goods are sold." *Id.* (internal quotation marks and citation omitted). On the other hand, "direct competition between the products is not a prerequisite to relief," and "products that share the same channel of trade are not necessarily proximate." *The Sports Auth., Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 963 (2d Cir.1996) (internal quotation marks and citations omitted).

M & G has failed to show that its products are proximate to Sony's Magic Gate products. In particular, Sony uses the MG Designation on proprietary computer storage devices which feature sophisticated copyright protection technology. M & G does not sell products which

are proximately related to computer storage devices or copyright protection technology. Accordingly, the Court finds that Judge Boyle correctly found that this factor favors Sony.

### d. Likelihood of Bridging the Gap

Judge Boyle found that this factor favored Sony. M & G argues that Judge Boyle failed to consider a "zone of expansion" theory. "Under this factor, if the owner of a trademark can show that it intends to enter the market of the alleged infringer, that showing helps establish a future likelihood of confusion as to source." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 874 (2d Cir. 1986). This factor intends to protect the trademark owner's "interest in being able to enter a related field at some future time." *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir. 1976). M & G does not intend to enter the markets for copyright protection technology or for computers. Accordingly, Judge Boyle correctly found that this factor favored Sony.

### e. Quality of the Products

Judge Boyle found that this factor favored Sony. M & G argues that the high quality of M & G's and Sony's products increases the likelihood of confusion. In assessing this factor, the poor quality of products sold under a defendant's trademark generally is relevant to a senior user's interest in protecting its mark's reputation from being tarnished by a junior user's inferior product. *Gillette Co.*, 984 F.2d at 575 (citing *Scarves by Vera*, 544 F.2d at 1172). M & G does not dispute the high quality of Sony's products. Accordingly, Judge Boyle correctly found this factor favored Sony.

### f. Buyer's Sophistication

Judge Boyle found that this factor favored Sony. M & G argues that the sophistication of Sony's customers increases the likelihood of confusion between M & G's and Sony's products. In assessing the likelihood of confusion between products, the sophistication of the relevant purchasers is relevant. *Gillette Co.*, 984 F.2d at 575. Because both customers of M & G's products and Sony's Magic Gate products are sophisticated, Judge Boyle correctly found this factor favored Sony.

### g. Actual Confusion

Judge Boyle found that this factor favored Sony because M & G failed to submit any survey evidence or testimony of customers to prove actual confusion. M & G concedes that they did not show actual confusion but argues that Judge Boyle should not have adopted a negative inference due to M & G's failure to present any evidence of consumer confusion. A plaintiff need not show actual confusion. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986) (citation omitted). However, the complete absence of actual confusion after a lengthy period of time creates an inference that future consumers will not be confused. *See. id.* Based on M & G's failure to present any consumer survey evidence or customer testimony, Judge Boyle correctly drew an adverse inference against M & G and found this factor favored Sony.

### h. Defendant's Good Faith in Adopting the Mark

Judge Boyle found that this factor favored Sony. M & G argues that Judge Boyle overlooked Sony's bad faith acts in adopting the MG Designation. In assessing this factor, the court "looks to whether the defendant adopted [the plaintiff's] mark with the intention of capitalizing on

plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang*, 949 F.2d at 583 (internal quotation marks and citation omitted). M & G has failed to show Sony acted in bad faith. The MG Designation indicates Sony's products that utilize the Magic Gate technology. In addition, Sony did not deliberately disregard the PTO's determination because it did not use the MG Designation on speakers and products which M & G sold. Further, counsel for Sony acted appropriately when he conducted an independent investigation of M & G's business and sent a letter to its president requesting consent to use the MG Designation. Accordingly, the Court finds that Judge Boyle correctly found that this factor favored Sony.

Based on the foregoing, the Court finds that Judge Boyle correctly applied the *Polaroid* factors in evaluating the likelihood of confusion between M & G's products and Sony's Magic Gate products.

### 4. The Fourth Objection—Irreparable Harm

■ M & G objects to Judge Boyle's report on the ground that he found M & G will not suffer irreparable harm. The Court finds this objection is without merit. Where, as here, the plaintiff fails to show a likelihood of confusion or likelihood of success on the merits, she must make an independent showing of likely irreparable harm. *Fed. Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 174 (2d Cir.2000) ("[I]f the plaintiff does not show likelihood of success on the merits, it cannot obtain a preliminary injunction without making an independent showing of likely irreparable harm.").

M & G argues that it will suffer immeasurable and irreparable injury if Sony's purported trademark infringement is not immediately enjoined. This conclu-

sory statement is insufficient to show irreparable harm. In addition, M & G has presented no evidence of a risk of loss of reputation, lack of quality control, inability of Sony to pay damages if liable, or other tangible harm. *See Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971). Accordingly, the Court finds that Judge Boyle correctly found that M & G failed to make an independent showing of likely irreparable harm.

### 5. The Fifth Objection—Balance of Hardships

M & G objects to Judge Boyle's report on the ground that he found M & G did not clearly establish the balance of hardships tipped decidedly in its favor. The Court finds this objection is also without merit. While M & G has made no showing of irreparable harm, Sony has demonstrated that it would suffer immeasurably if an injunction were entered against it. Enjoining Sony from using the MG Designation would force Sony to alter its electronics products; shut down its California assembly plant; lay off assembly line employees; and suffer immeasurable goodwill with its retailers and customers. Accordingly, the Court finds that Judge Boyle correctly found that the balance of hardships did not tip in M & G's favor.

### 6. The Sixth Objection—Delay

■ M & G objects to Judge Boyle's report on the ground that he found M & G delayed in moving for injunctive relief. Again, the Court finds this objection is without merit. Judge Boyle properly considered M & G's delay in seeking injunctive relief. "A district court should generally consider delay in assessing irreparable harm." *Tom Doherty*, 60 F.3d at 39. Here, M & G learned of Sony's MG Designation in October 2001 and shortly thereaf-

ter the parties engaged in settlement negotiations which terminated on January 29, 2002. On November 16, 2001, M & G commenced this action and filed a motion for a preliminary injunction on February 15, 2002. M & G then withdrew its motion and after expedited discovery refiled its motion for a preliminary injunction on May 2, 2002. It was not unreasonable for Judge Boyle to consider as a factor against irreparable harm that M & G waited months after it commenced this action to move for a preliminary injunction; did not seek expedited review; and withdrew the motion and then refiled it. Accordingly, the Court finds that Judge Boyle properly considered M & G's delay in seeking injunctive relief.

## B. As to the Preliminary Injunction

In seeking a preliminary injunction, the movant must show: (1) irreparable harm absent the .injunction; and (2) either (a) likelihood of ultimate success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the moving party. *See Random House*, 283 F.3d at 491. Where, as here, the injunction will among other things alter the status quo, the movant must make a "clear showing that [she] is entitled to the relief requested, or where extreme or very serious damage will result from denial of preliminary relief." *See supra* Part II.A.2.

To establish irreparable harm and a likelihood of success on the merits in a trademark infringement case, the movant need only show that the use of a particular mark is likely to confuse consumers as to the source of the product. *Am. Cyanamid Co. v. Campagna per le Farmacie in Italia S.P.A.*, 847 F.2d 53, 55 (2d Cir.1988) (*per curiam*). M & G argues a likelihood of confusion exists under a theory of reverse confusion. "The reverse confusion

theory protects the mark of a prior user from being overwhelmed by a subsequent user, typically where the subsequent user is larger and better known and consumers might conclude that the senior user is the infringer." *Mejia and Assocs., Inc. v. Int'l Bus. Machs.*, 920 F.Supp. 540, 546 (S.D.N.Y.1996). In essence, M & G claims that consumers are likely to assume mistakenly that Sony is the source of M & G's goods.

In a reverse confusion case, the court assesses likelihood of confusion under the *Polaroid* factors. *See Banff*, 841 F.2d at 491. As noted above, a review of the *Polaroid* factors reveals that all eight factors favor Sony. *See supra* Part II. A.3.a-h. In addition, the evidence shows that Sony and its retailers do not aggressively advertise the Magic Gate technology thereby defeating the reverse confusion theory. *See* McCarthy § 23:10 ("A reverse confusion case is proven only if the evidence shows that the junior user was able to swamp the reputation of the senior user with a relatively much larger advertising campaign.").

Even giving great weight to the PTO's denials of Sony's trademark application, which were based on an examiner's review of a photocopy of each mark and her assumption that Sony intended to use the MG Designation on speakers and other goods which M & G sold, the Court finds that M & G has failed to show a clear likelihood of confusion between M & G's products and Sony's Magic Gate products. Accordingly, M & G is unable to show irreparable harm and a likelihood of success on the merits.

M & G is also unable to show sufficiently serious questions going to the merits because all of the *Polaroid* factors favor Sony. And, the balance of hardships favors Sony because an injunction will harm it immeasurably. *See supra* Part II.A.5. Ac-

cordingly, M & G has failed to make a clear showing that it is entitled to the requested relief or that very serious damage will result absent injunctive relief.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that the report and recommendation of Judge Boyle is adopted and the motion for a preliminary injunction is **DENIED**.

**SO ORDERED.**