**MONTBLANC–SIMPLO GmbH and MONTBLANC, INC., Plaintiffs,**

v.

**AURORA DUE S.R.L. and Kenro Industries, Inc., Defendants**

No. 01–CV–5451(JS).

United States District Court, E.D. New York.

Feb. 22, 2005.

Ethan Horwitz, Esq., Kandis M. Koustenis, Esq., Goodwin Procter LLP, New York, for Plaintiffs.

Mark I. Peroff, Esq., Darren W. Saunders, Esq., Kirkpatrick & Lockhart LLP, New York, for Defendants.

### MEMORANDUM, DECISION AND ORDER AFTER BENCH TRIAL

SEYBERT, District Judge:

On August 13, 2001, Plaintiffs Montblanc–Simplo GmbH and Montblanc, Inc. (collectively referred to as "Montblanc") commenced this action against Defendants Aurora Due S.r.L. and Kenro Industries, Inc. (collectively referred to as "Aurora") alleging breach of contract, trademark infringement, unfair competition and false designation in violation of the Lanham Act and New York common law, and trademark dilution under New York General Business Law § 360–*l*. Defendant Aurora has filed a counterclaim for breach of contract. This Court presided over a four-day bench trial to determine issues of liability and damages.

### INTRODUCTION

Plaintiff Montblanc–Simplo GmbH is a limited liability company organized and existing under the laws of Germany with its principal office in Hamburg, Germany. Plaintiff Montblanc, Inc., is a corporation organized and existing under the laws of New Jersey that merged into Montblanc North America LLC on April 1, 2002.

Defendant Aurora Due S.r.L. is an Italian limited liability business entity; with its principal office in Torino, Italy. Defendant Kenro Industries is a corporation organized and existing under the laws of the state of New York with its principal office in Mineola, New York. Kenro Industries is

the exclusive United States distributor of Aurora pens.

Both Montblanc and Aurora manufacture and sell high quality writing instruments. This action concerns two particular product lines—Montblanc's Meisterstück and Aurora's Optima. Montblanc alleges that the Optima line infringes upon the Meisterstück line by copying the Meisterstück's trademarked three-ring decoband. Montblanc contends that Aurora is appropriating the prestige, success and recognition that Montblanc has worked so hard to establish in marketing its Meisterstück pen. Montblanc has filed claims for trademark infringement, unfair competition and false designation in violation of the Lanham Act and New York common law, and trademark dilution under New York General Business Law § 360–*l*.

Montblanc also alleges that Aurora's distribution of Optima writing instruments violates a 1998 settlement agreement ("Settlement Agreement") entered into between the Parties. The Settlement Agreement resolved a prior litigation involving similar infringement claims by Montblanc against Aurora concerning the band design on an earlier version of the Optima. Montblanc has filed a claim for breach of contract based on Aurora's alleged continued use of the infringing decoband.

According to Aurora, Montblanc's Lanham Act and New York common law trademark claims are lacking. Aurora maintains that Montblanc's three-ring design is not distinctive, and that Montblanc has not demonstrated any likelihood that the public would confuse an Optima pen with a Meisterstück pen. Additionally, Aurora maintains that its manufacture and sale of the Optima line were fully compliant with the terms of the Settlement Agreement. Aurora contends that Mont-

blanc violated the terms of the Settlement Agreement by bringing this action.

Based upon the evidence and arguments presented, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any of the findings of fact may be deemed conclusions of law, they also shall be considered conclusions. Likewise, to the extent that any of the conclusions of law may be deemed findings of fact, they shall be considered findings. *See Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405, 413–14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

### FINDINGS OF FACT

### *Montblanc And The Meisterstück*

Montblanc was founded in Hamburg, Germany in 1906. Ex. 4. Montblanc is a long time manufacturer of high-quality writing instruments. (Tr. 33–34; Ex. 4.) The company is part of the Richemont Group, owner of a collection of luxury brands, primarily in the areas of watches, jewelry, writing instruments and accessories. (Tr. 31–32.) Montblanc sells its products worldwide, and has sizable sales in the United States. (Tr. 67–69; Exs. 23, 24.) The most well-known and successful line of Montblanc's writing instruments is the "Meisterstück" (German for "masterpiece") line. (Tr. 38–41; Platt dep. 116–17.) Montblanc has been manufacturing the Meisterstück line since 1924. (Ex. 4.) Generally, Meisterstück pens sell in the suggested retail price range of $195 to $500. (Ex. Y.)

While Meisterstück pens come in a variety of sizes and writing models (such as fountain, ball point, and roller ball), all Meisterstücks share certain common fea-

tures. (Tr. 34.) All Meisterstücks have a three-ring decoband, a cigar shape, and a dome-shaped cap bearing a white star. (Tr. 34–35, 40, 76, 107–08.) Additionally, the vast majority of Meisterstück pens are sold in a black resin color. (Tr. 35, 106; Ex. Y.)

Montblanc first added the three-ring decoband to the Meisterstück in 1939. (Tr. 242, 245.) Today, Montblanc has two valid and subsisting federal trademark registrations for the three-ring decoband. (Exs.1, 2.) The first trademark registration, dated October 13, 1992, defines the mark as "for: writing instruments; namely pens and pencils. . . . The mark consists of the outline of a star design and the width, shape and placement of gold bands on the cap for the goods." (Ex. 2.) The second trademark registration, dated April 25, 1995, defines the mark as: "for: writing instruments; namely pens and pencils. . . . The mark consists of the width, shape and placement of bands on the cap for the goods, and of the color gold for such bands." (Ex. 1.) Montblanc has filed numerous infringement lawsuits in an effort to protect the three-ring decoband trademark. The vast majority of these actions were never tried because Montblanc settled with the alleged infringer. (Tr. at 133–134, 143–162; Ex. 15.)

The white star, which is also found on all Meisterstück pens, is Montblanc's company logo. (Tr. 83–84, 273.) The white star has been used on every Montblanc pen manufactured since the 1920's, and is a component of the October 1992 trademark definition. (Tr. 83–84, 137; Ex. 2.) The white star is used in all Montblanc advertising, and also appears on Montblanc product packaging, Montblanc in-store displays, and the roof of Montblanc's company headquarters in Germany. (Tr. 85–88.)

In the late 1980's Montblanc began to expend considerable funds advertising the Meisterstück. (Ex. 4, 22, 29, Tr. 38, 41, 64–65.) Montblanc spent millions of dollars advertising in life-style magazines, such as "GQ," "Conde Nast Traveler" and "Vogue," and newspapers, such as "The New York Times" and "The Wall Street Journal." (Tr. 41.) In recent years, the Meisterstück has appeared, through a process known as "product placement," in numerous television shows. (Tr. 46–49, 78.) The promotional efforts are geared towards establishing the Meisterstück as the premier luxury pen, and Montblanc as a luxury brand. (Tr. 40, 52, 61–62.)

Montblanc has realized its goal of becoming a premier luxury brand, and has expanded its business to include product lines that are unrelated to writing instruments. (Tr. 56–57, 61–62, 70; Exs. 6, 47, 48, 50, 57–63.) In the late 1980's, Montblanc basically sold pens and leather accessories specifically relating to pens. (Tr. 56.) Now, Montblanc sells belts, accessories, watches and fragrances. (Id.) Many of these products have a three-ring decoband. (Tr. 56–57.) Virtually all of these products have a white star, although many times the star is not prominently displayed. (Tr. 57–58.)

### Aurora And The Optima

Aurora is also a long-time manufacturer of high quality writing instruments. (Tr. 321, 326.) Aurora is a small, family-run business, started in Torino, Italy in 1919. (Tr. 324–26, 347–49, 390; Ex. W,Y.) Aurora manufactures ten different product lines of pens. (Tr. 348.) Aurora distributes its pens worldwide, deriving approximately fifteen percent of its business from United States markets. (Tr. 355, 513.)

In the early 1990's, Aurora began distributing a model of writing instruments known as Optima (the "1990 Optima"). (Tr. 371, 383; Ex. 43.) The 1990 Optima was a re-introduction of a 1930's Aurora

pen of the same name. (Tr. 371–73, 382; Ex. J.) The 1990 Optima shared some of its predecessor's characteristics. Most notably, the 1990 Optima bore a three-ring decoband with a Greek key pattern. (Tr. 485; ex. 43, J, YY.) There were also differences between the 1990 Optima and its predecessor. (Tr. 483–84.) The original Optima had the same color throughout its body, but the 1990 Optima had a black top and bottom, which differed in color from the remainder of the body. (Tr. 483.) Additionally, unlike, its predecessor, a portion of the 1990 Optima's body is "see through," allowing the writer to see the amount of ink remaining in the pen. (Tr. 484.) The pens also had different clips. (Tr. 483.)

The Optima line is Aurora's most expensive pen line, but only accounts for ten percent of the company's revenue. (Tr. 348, 391.) Generally, the suggested retail price of an Optima ranges from $175 to $385. (Ex. Y.) Optima pens come in a wide variety of colors, including black. (Ex. C; Tr. 674.) The best selling Optima pens have brightly colored marbleized finishes of green or blue. (Tr. 561, 674.) The solid black versions of the Optima do not sell as well as other versions of the pen. (Tr. 561.)

### The 1997 Lawsuit And 1998 Settlement Agreement

In 1997, after learning of U.S. sales of the 1990 Optima, Montblanc sued Aurora for, *inter alia,* trademark infringement. (Ex. 25.) Specifically, Montblanc objected to Aurora's use of a three-ring decoband design on the 1990 Optima pen. (*Id.*) Montblanc alleged that the 1990 Optima ring design infringed on the trademarked decoband found on the Meisterstück. (*Id.*)

The Parties settled the lawsuit, adopting the March 25, 1998 Settlement Agreement. (Ex. 26.) Under the Settlement Agreement, Aurora promised to cease United States distribution of the three-ring design, or any "colourable imitation" thereof,[1] in conjunction with the 1990 Optima pen. (Tr. at 163–164, 407–08; Ex. 26.) The Settlement Agreement did not require Aurora to immediately cease distribution of the 1990 Optima. (Ex. 26.) Instead, the Agreement contained a "phase out" provision, which allowed Aurora until December 31, 1999 to cease distribution of the allegedly infringing design. (*Id.*) The Settlement Agreement also listed several Aurora models, such as Ethiopia, that were expressly excluded from any distribution limitations. (*Id.*) In return, Montblanc agreed to dismiss all legal claims against Aurora. (*Id.*) Montblanc further pledged that it would not assert any claims or otherwise object to Aurora's use of ring/band designs with more or less than three rings. (*Id.*) Additionally, contemporaneous with the Settlement Agreement, the Parties executed a side letter agreement ("Side Agreement") whereby Montblanc promised to pay Aurora 150,000 Deutsche marks ("DM") "in consideration of expenses incurred in redesigning and retooling of Aurora's Optima line of pens." (Tr. 167–68; Ex. 27.)

While the Side Agreement remained in force, the March 25, 1998 Settlement Agreement was superseded by a September 15, 1998 Settlement Agreement. (Ex. 34.) The only pertinent revision to the Settlement Agreement extended the prohibitions of Paragraph 1 to prevent use of the 1990 Optima decoband on any pen manufactured by Aurora—not just the Op-

---

**1.** In the Settlement Agreement, the Parties utilized the "European" spelling of the word colorable. The Court adopts such spelling for the purposes of this opinion.

tima pen that was the subject of the 1997 lawsuit. (Tr. at 168–172; Ex. 34.) [2]

### The Refurbished Optima And The Pending Action

Beginning in January 2000, Aurora redesigned the Optima, changing the number of "rings" on the decoband from three to five (the "Refurbished Optima"). (Tr. 426, 497.) The band, as a whole, remained the same size. (Ex. 44.) The center, bottom and top rings were each reduced in width approximately one millimeter. (*Id.*) The two additional rings are less than one millimeter wide and are located above and below a center ring that is approximately one-half of a centimeter wide. (*Id.*) The additional rings are only visible upon very close inspection, rendering the Refurbished Optima virtually identical to its predecessor. (Tr. at 235–36, 257–60, 622–26, 680–81; *compare* Ex. 43 *with* Ex. 44.)

Upon learning that Aurora was distributing the Refurbished Optima in the United States, Montblanc contacted Aurora and requested that the company cease distribution immediately. (Tr. 172–74. Ex. 76.) Montblanc believed that the Refurbished Optima was a colourable imitation of the 1990 Optima, and, thus, Aurora was violating the terms of the Settlement Agreement. Aurora refused to cease manufacturing the pen, citing the provision of the Settlement Agreement that permitted Aurora to manufacture pens with any band containing more or less than three rings. In August 2001, after failing to reach an amicable resolution with Aurora, Montblanc commenced this action. (Tr. 172–74, 233–35.)

### CONCLUSIONS OF LAW

### I. Breach of Contract Claims

■ In order to establish a claim for breach of contract, a party must establish:

(1) the existence of an agreement; (2) adequate performance of the agreement; (3) breach; and (4) damages. *See Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir. 1996); *Designers N. Carpet, Inc. v. Mohawk Indus.,* 153 F.Supp.2d 193, 197 (E.D.N.Y.2001).

The Parties do not dispute the existence or validity of the Settlement Agreement or the Side Agreement. This dispute stems from the Parties disagreement concerning the proper interpretation and construction of two provisions of the contract, specifically paragraphs 1 and 9.

Paragraph 1 provides:

Aurora will cease the offering for sale, distribution and use in the United States of America of its three ring design—a decoband featuring a large middle band and two smaller rings (as depicted in Exhibit A)—and/or any colourable imitation thereof . . . on the pen range shown in Exhibit B . . . or on any other pen.

Paragraph 9 provides:

Montblanc shall not object to Aurora's use in any product of any ring/band design with more or less than three rings/band, i.e. one, two, four, five, etc. These rings/bands may each have any height, width, distance apart, colour, material and be positioned anywhere on any product.

(Ex. 34.)

Montblanc argues that Aurora's distribution of the Refurbished Optima violates Paragraph 1 because the decoband design found on the Refurbished Optima is a "colourable imitation" of the decoband found on the 1990 Optima. Montblanc urges that the only fair reading of the contract qualifies the sweeping language of Para-

---

**2.** Hereinafter, in the interest of simplicity, any reference to the Settlement Agreement refers to the Settlement Agreement as revised on September 15, 1998.

graph 9 with the provisions of Paragraph 1.

Aurora claims that, because Optima's refurbished decoband has five rings, Paragraph 9 applies and precludes Montblanc from objecting to the design. Aurora relies on a plain reading of Paragraph 9's sweeping language, which bars Montblanc from challenging any ring/band design, regardless of the width of the rings or the distance between the rings, provided that the band contains more or less than three rings. According to Aurora, any interpretation of the contract permitting Paragraph 1's application to a 5–ring band would contradict the plain meaning of Paragraph 9, rendering Paragraph 9 meaningless.

### Interpretation of Paragraphs 1 & 9

■ In determining the scope of a contract, the Court is required to "ascertain the parties' intent based on the language they used." *Consarc v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir.1993); *see PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir.1996). Where the contract's terms are unambiguous, the Court may not go beyond the face of the contract in interpreting the contract's meaning. *See Consarc*, 996 F.2d at 573. Where, however, reasonable minds could differ as to the meaning of certain contractual terms, the Court may consult extrinsic evidence to determine the parties' intended meaning. *See id.* After reviewing the Settlement Agreement, the Court con-

cludes that both Paragraphs 1 and 9 are unambiguous, and, accordingly, interprets the contract without resort to extrinsic evidence.[3]

■ A court interprets a contract by looking at the document as a whole. *See W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990); *DelDuca v. DelDuca*, 304 A.D.2d 610, 611 758 N.Y.S.2d 145, 146 (2d Dep't 2003). Contracts must be interpreted so as to give effect to the contract's primary purpose and conflicting provisions should be read in harmony, if possible. *See Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 100 (2d Cir.1997). Where the strict reading of one provision will render another provision meaningless, or without effect, such reading should be rejected. *See Manley v. Ambase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003) Undergirding a court's construction of any contract is the manifest purpose of the agreement. *See Williams Press, Inc. v. State of New York*, 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 77, 335 N.E.2d 299, 302 (1975).

■ The purpose of the Settlement Agreement was to terminate Montblanc's 1997 trademark action against Aurora concerning the 1990 Optima's allegedly infringing decoband design. (Tr. 164, 407–08, 411.) Aurora agreed to cease, by December 31, 1999, distributing for sale in the United States the 1990 Optima, and any pens that bore a band design similar

---

**3.** The parties do not dispute that Paragraph 9 is unambiguous. Aurora argues that Paragraph 1 is ambiguous because of the use of the term "colourable imitation." The Court rejects this assertion. While the term colourable imitation calls for a subjective assessment, Aurora has not established that reasonable minds would actually differ on what the term actually refers to—whether a band design looks just like the band found on the 1990 Optima. Moreover, were the Court to find the term ambiguous, consulting extrinsic evidence would not change any of the Court's conclusions. The Court certainly would not concur with the definition provided by Aurora's President—that the term "colourable imitation" referred to "exactly the same ring with different colors." Nor would the Court, *sua sponte*, introduce a new term into Paragraph 1 by imposing a three-ring limitation into the term "colourable imitation."

to that found on the 1990 Optima. In return, Montblanc dismissed its pending action, and paid Aurora 150,000 DM to modify its band design. Such compensation, far from nominal, evidences an understanding between the parties that the 1990 Optima replacement would differ in a manner that could be perceived by the average consumer.

It is apparent from the Settlement Agreement that Aurora, appropriately, did not wish to concede any more than necessary concerning its ability to employ creative pen designs. As evidence of this, the Settlement Agreement provides numerous exclusions for specific Aurora models. (Tr. 165–66, Ex. 34.) Moreover, Paragraph 9 assured Aurora that Montblanc would not object to any Aurora designs bearing more or less than three rings.

However, the construction urged by Aurora, which would permit the use of a decoband that is the same size, and is virtually indistinguishable in design from the subject of the Settlement Agreement, is not consistent with the purpose of the Settlement Agreement. The additional rings that have been added to the Refurbished Optima are virtually indiscernible. Indeed, there is no appreciable difference between the 1990 Optima band and the Refurbished Optima band. While the Court will not go so far as to conclude that Paragraph 9 is "subject to" Paragraph 1, the Court concludes that the additional rings contemplated by Paragraph 9 are not the type of "rings" that Aurora purports distinguish the 1990 Optima from the Refurbished Optima.

The Court rejects Aurora's assertion that any compromise of the expansive breadth of Paragraph 9 renders the provision meaningless. Paragraphs 1 and 9 are not inherently conflicting. The two provisions can be harmonized. Aurora is free to implement a band design that looks similar to the 1990 Optima, but contains more or less than three bands, provided those bands can actually be perceived by the consumer. For example, Aurora might increase the band size by adding an additional ring to the top or bottom of the 1990 Optima band, provided the additional ring would be discernible by the average consumer.

Having determined that Paragraph 9 of the Settlement Agreement does not provide a safe harbor for additional rings that are not appreciable to the average consumer, the Court must determine whether the Refurbished Optima is a "colourable imitation" of the 1990 Optima. The Court interprets the term "colourable imitation" in accordance with its plain meaning—a copy that gives the same impression as the original.[4]

As previously recognized by the Court, the refurbished pen is virtually identical to its predecessor. The additional "rings" are unascertainable unless a party is directed to look for them. (Tr. 626.) The pen's body is virtually the same size and the band is placed in exactly the same location. It is without question that the Refurbished Optima is a "colourable imitation" of its predecessor. (*Compare* Ex. 43 *with* Ex. 44.)

Based on the foregoing, the Court finds that Aurora breached the Settlement

---

4. While recognizing that the Lanham Act provides a precise definition of "colourable imitation," the Court declines to apply that definition where the point of comparison is not a trademarked item. *See* 15 U.S.C. § 1127. Importantly, the Settlement Agreement limits Aurora's ability to implement decoband designs based on the decoband's similarity to the band found on the 1990 Optima—not the Montblanc Meisterstück. Moreover, it is unclear that the Aurora representatives who negotiated the Settlement Agreement on Aurora's behalf—none of whom were attorneys—would have appreciated this legal term of art.

Agreement by distributing the Refurbished Optima pen for sale in the United States after December 31, 1999.

The Court finds the other elements of Montblanc's breach of contract claim satisfied. Montblanc performed its end of the bargain by dismissing the 1997 lawsuit and tendering to Aurora 150,000 DM. Further, Montblanc complied with the Settlement Agreement's requirement that the parties use their best efforts to resolve any dispute amicably before initiating legal steps. Additionally, Montblanc was damaged by Aurora's breach. Montblanc received no benefit from the 150,000 DM paid to Aurora so that Aurora could redesign the Optima in a meaningful way. Moreover, Montblanc did not receive the performance it bargained for—keeping off the market a design that it believed diminished the prestige of its three-ring decoband.

Because Aurora's counterclaim for breach of contract is contingent on the propriety of Montblanc bringing the instant action, the Court need not address Aurora's breach of contract claim.

## II. Trademark Infringement, Unfair Competition And False Designation Of Origin Claims

■ In order to establish claims for trademark infringement, unfair competition and false designation of origin under the Lanham Act and New York common law, a party must demonstrate the ownership of a valid enforceable trademark, and a likelihood of confusion among an appreciable number of consumers. *See Playtex Prod., Inc. v. Georgia–Pacific Corp.*, 390 F.3d 158, 161 (2d Cir.2004); *Time, Inc. v. Petersen Publ'g Co., L.L.C.*, 173 F.3d 113, 117 (2d Cir.1999); *Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, 00–CV–5304, 2004 WL 896952 at *2 (E.D.N.Y. Mar.26, 2004). The Court separately evaluates each of these criteria.

### Validity & Enforceability

■ A federal trademark registration is prima facie evidence of the validity of a mark and of a registrant's exclusive right to use the mark. *See* 15 U.S.C. § 1057(b). Under the Lanham Act, the validity of a trademark and a right to exclusive use becomes "incontestable" when the mark has been used continuously in commerce for five consecutive years from the date of registration. *See* 15 U.S.C. § 1065; *Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F.Supp.2d 271, 277 (S.D.N.Y. 1998).

It is undisputed that Montblanc is entitled to the "incontestable" presumption of the Lanham Act. Despite raising concerns about Montblanc's original trademark application, even Aurora concedes that the registration is valid. (Defs.' Proposed Conclusions of Law at 6). Here, the question is the degree of protection afforded to Montblanc's three-ring decoband.

### Likelihood of Confusion

■ Judge Friendly's eight *"Polaroid"* factors govern the Court's "likelihood of confusion" analysis. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961). Specifically, the Court considers: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two products; (3) the proximity of the products; (4) the likelihood that the owner will bridge the gap; (5) evidence of actual confusion; (6) defendant's good faith in adopting the mark; (7) the quality of the defendant's product; and (8) the sophistication of consumers. *See id.* No factor is outcome determinate, although some courts have indicated that greater weight should be attributed to the first three factors. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 256–58 (2d Cir.1987).

Here, Montblanc offers four distinct theories of confusion: (1) source confusion; (2) post-sale confusion; (3) initial interest confusion; and (4) subliminal confusion. Source confusion occurs when a customer, while recognizing that he is purchasing a product made or sold by a junior user, believes that there is some endorsement between the junior user and senior user. *See Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.,* 486 F.Supp. 414, 428 (S.D.N.Y.1980). Post-sale confusion refers to confusion encountered by the general public, perceiving the junior user's product after it has been purchased and associating the product with the senior user's product. *See Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 218 (2d Cir. 1999). Initial interest confusion occurs when a purchaser, while fully aware of the source of the product, is attracted to the junior user's product because of the competitor's use of a mark similar to that held by the senior user. *See Mobil Oil,* 818 F.2d at 259–60. Finally, subliminal confusion occurs when the junior user's mark "confus[es] or dece[ives] [the consumer] on a subliminal or subconscious level, causing the consumer to identify the properties and reputation of one product with another, although he can identify the particular manufacturer of each." *Ortho Pharm. Corp. v. American Cyanamid Co.,* 361 F.Supp. 1032, 1044 (D.N.J.1973).

The Court first applies the *Polaroid* factors and then addresses each of the confusion claims.

### The Strength Of The Mark

"The strength of a mark refers to its distinctiveness, or its tendency to identify the goods as emanating from a particular source, even when the source is unknown to the customer." *Pfizer,* 2004 WL 896952 at *3 (quoting *Tri–Star Pictures, Inc. v. Unger,* 14 F.Supp.2d 339, 354 (S.D.N.Y.1998); *Arrow Fastener Co., Inc.*

*v. Stanley Works,* 59 F.3d 384, 391 (2d Cir.1995)). The "inquiry regarding the strength of a mark often parallels the inquiry concerning the mark's validity, inasmuch as the strength or distinctiveness of a mark determines both the ease with which it may be established as a federal trademark and the degree of protection it will be afforded." *Arrow,* 59 F.3d at 391 (internal quotations omitted). However, the determination that a mark is valid and incontestable does not necessitate a finding that the mark is strong and entitled to an expansive breadth of protection under the Lanham Act. *See id.* at 393–94 (distinguishing between the validity and secondary meaning of a mark and the breadth of protection afforded to the mark under trademark law).

Trademarks are classified in four basic categories of distinctiveness, in "ascending order of protectability and strength:" (1) generic; (2) descriptive; (3) suggestive; and (4) fanciful or arbitrary. *Lexington Mgmt.,* 10 F.Supp.2d at 279; *see also Brown v. It's Entertainment, Inc.,* 34 F.Supp.2d 854, 858 (E.D.N.Y.1999). Generic marks are commonplace and are not afforded any protection under the trademark laws. *Arrow,* 59 F.3d at 391; 2 *McCarthy on Trademarks & Unfair Competition* § 11:1 (4th Ed.2004). Descriptive marks can only become registered trademarks if the owner establishes secondary meaning associated with the mark. 2 *McCarthy* § 11:15. Suggestive, fanciful and arbitrary marks are all "inherently distinctive" marks and may be registered even without a showing of secondary meaning. *See Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 143 (2d Cir.1997); *Arrow,* 59 F.3d at 391. A suggestive mark "offers suggestions of, but does not actually describe the features of a product." *Id.* Fanciful marks are marks "that have been invented or selected for

the sole purpose of functioning as a trademark." 2 *McCarthy* § 11:5. Arbitrary marks consist of common-place words or symbols that are used in connection with a specific product or service, but otherwise lack any connection with the product or service. *See Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075–76 (2d Cir.1993); 2 *McCarthy* §§ *11:11–12.*

█ Montblanc argues, alternatively, that the three-ring decoband is either inherently distinctive,[5] or has acquired significant secondary meaning. Under either label, Montblanc maintains that the three-ring decoband is a strong mark, entitled to the broadest scope of protection under the Lanham Act.

The Court finds that the three-ring decoband is not inherently distinctive. After reviewing the record, the Court concludes that there is simply nothing inherently distinctive about the use of a decoband design—two-ring, three-ring, four-ring, or otherwise—on a quality pen. (*See* Tr. at 294, 397, 575; Ex. Y.) Additionally, Montblanc's registration of the mark by proof of distinctiveness under Section 2(f) weighs against a finding of inherent distinctiveness. *See* 15 U.S.C. § 1052(f). If the three-ring decoband were inherently distinctive, such an application would not be necessary because no proof of acquired distinctiveness or secondary meaning is necessary to register an inherently distinctive mark. While the Court agrees with Montblanc that registration under Section 2(f) does not preclude a determination of inherent distinctiveness, the Court finds that registration under Section 2(f) weighs against a finding of inherent distinctiveness in this case. *See* 2 *McCarthy* § 11:53.

The determination that a mark is not inherently distinctive, however, does not mean that a mark is "weak." A mark may have established significant "secondary meaning" among consumers so that consumers associate that product with a particular manufacturer. In determining the strength of a mark's secondary meaning, the Court may consider a number of factors. *See Genesee,* 124 F.3d at 143 n. 4. Montblanc cites advertising expenditures, unsolicited media coverage, sales success, a substantial history of "cleaning up the marketplace" and long-time exclusive use of the three-ring decoband as evidence of the mark's substantial secondary meaning. The case, however, is not as strong as Montblanc suggests.

In order for Montblanc's advertising expenditures to be relevant to the strength of the decoband mark, the advertising must call attention to the decoband mark. *See Estee Lauder, Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1510 (2d Cir.1997) (" '[S]trength' ... ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source."); 2 *McCarthy* § 15:52. The Court finds that, in advertising the Meisterstück pen, the primary means by which Montblanc communicates its brand to the consumer is through the MONTBLANC company name, and the white star logo—not the three-ring decoband. (Tr. at 85, 95, 112.) The white star logo is found on all advertising, product packaging, company letterhead, in-store displays, and on the outside storefront of company owned boutiques, while the three-ring band is not. (Tr. at 85.) Importantly, when questioned as to whether, in marketing the Meisterstück, Montblanc specifically focused attention on the three-ring decoband, the President and CEO of

---

**5.** Montblanc does not explain under which category of inherently distinctive marks (suggestive, arbitrary or fanciful), the three-ring decoband should be classified.

Montblanc North America stated that he was not sure. (Tr. At 95.) Additionally, Montblanc has failed to offer any studies indicating that consumer's associate the three-ring decoband with Montblanc. *See 20th Century Wear, Inc. v. Sanmark–Stardust, Inc.*, 815 F.2d 8, 10 (2d Cir.1987) (affirming the district court's finding that a mark was not distinctive where the owner failed to present surveys indicating that consumers associated the mark at issue with its owner); *M & G Electronics Sales Corp. v. Sony Kabushiki Kaisha*, 250 F.Supp.2d 91, 104 (E.D.N.Y.2003). Accordingly, the Court cannot attribute strong secondary meaning to the three-ring decoband based on Montblanc's advertising expenditures.[6]

Nor can the Court attribute substantial secondary meaning to the three-ring decoband based on unsolicited media attention to the three-ring decoband. While the record makes clear that the Meisterstück is a world renowned pen, Montblanc has offered only one article recognizing the decoband design. (*See* Ex. 7.)

The Court agrees with Montblanc that there have been substantial efforts to imitate the decoband mark. It is clear that, on hundreds of occasions, Montblanc has taken action to protect its three-ring decoband design. (*See* Ex. 15.) This factor weighs in favor of the strength of the three-ring decoband's secondary meaning. The Court finds that Montblanc's significant sales of the Meisterstück also weigh in favor of a finding of strength.

Length and exclusivity of use, however, weigh against the strength of the secondary meaning associated with the three-ring

decoband. Montblanc introduced the three-ring design on the Meisterstück in 1939. There is substantial evidence that, prior to the distribution of the three-ring Meisterstück, and at varying times until approximately 1960, numerous quality pen companies sold, in the United States, pens with a three-ring decoband design. (*See* Tr. at 581, 613–14.)

Montblanc argues that the Court must disregard such earlier use of three-ring bands because there is no evidence indicating that the pens were widely distributed or the marks were used or well-promoted. The argument misses the pivotal inquiry in assessing the probative value of third-party use: how the mark is used in connection with a particular product line. *See Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167, 1173 (2d Cir.1976) ("The significance of third-party trademarks depends wholly upon their usage"); *Lexington Mgmt.*, 10 F.Supp.2d at 281–82 (finding that evidence of similar registrations absent proof of what a company "does" with an alleged mark is not probative of third-party use). In the cases relied on by Montblanc, the evidence of third-party use of the mark consisted of only trademark registrations, without any indication of how the third-parties used the mark. *See Scarves by Vera*, 544 F.2d at 1173–74; *Lexington Mgmt.*, 10 F.Supp.2d at 281–282. Here, the evidence of third-party use consisted of companies using three-ring decobands in exactly the same fashion as Montblanc. Evidence that such pens were sold in the United States has a bearing on the strength of secondary meaning attributable to the use of a three-ring decoband. *See Lexington Mgmt.*, 10

---

**6.** The Court does not find probative Montblanc's use of a three-ring mark on various accessories and non-pen related products. Importantly, the register description for the three-ring decoband states that the mark only pertains to its use on writing instruments.

(*See* Ex. 1, 2.) Additionally, there was little evidence to indicate that, in advertising or selling such goods, Montblanc used the three-ring band in a manner that would indicate the source to the average consumer.

F.Supp.2d at 282 (recognizing the relevance of third-party use of plaintiff's trademark where the third parties "are engaged in activities akin to those of the plaintiff").

Notwithstanding the use of three-ring decobands from 1920–1960, there are four pens (aside from Montblanc pens) currently sold in the United States that have a three-ring decoband: (1) the Omas Ogiva; (2) the Waterman Charleston; (3) the Conway Stewart 58 Series; and (4) the Marlen Continenti. (*See* Ex. *OO*, PP, QQ, 20.) Omas and Waterman, like Aurora, are two of Montblanc's competitors in the luxury pen market. Such use of the three-ring decoband weighs against the finding of a strong mark.

Based on the foregoing, the Court concludes that, while the three-ring decoband is an incontestably valid mark, it is a relatively weak mark.

### Similarity of Marks

When assessing the similarity between two marks, "[t]he question is not merely how many points of similarity the marks share, but whether they create the same general overall impression." *Pfizer*, 2004 WL 896952 at *4; *see also Arrow*, 59 F.3d at 394. Montblanc contends that the Court should compare the decobands of the Meisterstück and the Refurbished Optima in isolation, without focusing on the pen as a whole. Aurora urges the Court to determine similarity by looking at the overall aesthetic impression of the two pens. Under either analysis, the Court concludes the marks are not similar.

If one focuses only on the two decobands, there are numerous distinctions. Most obvious, the Refurbished Optima decoband plainly displays the manufacturer's name, "AURORA," while the Meisterstück's decoband states "MONTBLANC MEISTERSTÜCK." Further, both decobands have, essentially, three rings—two thinner rings outside one wider middle ring—but the Refurbished Optima middle ring is approximately fifty percent larger than the Meisterstück middle ring. Finally, the Refurbished Optima decoband is approximately one-third larger than the Meisterstück's decoband, and displays a "Greek Key" pattern in the background. (*Compare* Exs. 30, 31 *with* Ex. 44.)

When looking at the bands in the context of the pens that bear them, there are some similarities, but more differences. The decobands are approximately located in the same position at the base of the cap, and the pens are approximately the same size. The overall shape of the pens, however differs substantially. The Refurbished Optima is flat at the top and bottom, while the Meisterstück is rounded at the top and bottom. The Refurbished Optima is most popularly sold in bright color finishes, while the Meisterstück is primarily sold in black. Finally, only the Meisterstück has the Montblanc white star located at the top of the cap.

### Competitive Proximity Of The Products

"This factor is concerned with the competitive distance between the products." *Arrow*, 59 F.3d at 396. The inquiry focuses on "whether a purchaser would easily confuse the source of the products based on their proximity in the market." *Id.*

There is no dispute that Montblanc's Meisterstück and Aurora's Refurbished Optima compete in the same channels of trade and appeal to the same class of customers. However, there is also no dispute that an original purchaser would not be mistaken as to whether he or she was purchasing a Meisterstück or an Optima. (Tr. 79, 116, 263.) Thus, the Court concludes that this factor gives little support to a likelihood of confusion in this case.

### Actual Confusion

Evidence of actual confusion is not necessary to establish a likelihood of confusion. *See Lexington Mgmt.*, 10 F.Supp.2d

at 287. However, where no evidence of actual confusion is proffered, the Court is permitted to draw an inference that confusion is not likely. *Merriam–Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir.1994). Here, Montblanc has failed to offer any evidence of actual confusion. Montblanc's failure to adduce such evidence is, most likely, a product of the nature of its confusion claims. Indeed, with the exception of the source confusion claim, Montblanc does not allege that any purchaser of a Refurbished Optima will ever mistake it for a Meisterstück.

Rather than present evidence of actual confusion through studies or surveys, Montblanc relies on the fact that Aurora is an alleged willful infringer. Montblanc argues that the Court should draw a "powerful inference" of actual confusion because Aurora "has engaged in a deceptive commercial practice." *Pfizer*, 2004 WL 896952 at *5 (E.D.N.Y.2004). The Court rejects this argument. The Refurbished Optima decoband is essentially the same as the 1930's Optima decoband. The decision to "reintroduce" an old pen line is a creative decision that is common-place in the premium pen manufacturing industry. Tr. at 296, 370. Moreover, Aurora's most successful Refurbished Optima models are brightly colored and bear no resemblance whatsoever to the Meisterstück. The Court finds no indication that Aurora was trying to deceive buyers into thinking the Refurbished Optima was a Meisterstück.[7]

### Likelihood That The Prior Owner Will Bridge The Gap

This factor is only pertinent when the trademark owner does not participate in the same market as the alleged junior user, and, thus, is not relevant here. *See, e.g., Arrow*, 59 F.3d at 397.

### Good Faith

The good faith inquiry focuses on whether "the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir.1991). Montblanc contends that Aurora's decision to "reintroduce" the Optima was spurred by Aurora's desire to capitalize on the growing fame and notoriety of the Meisterstück.

As previously discussed, the Court finds that Aurora did not have any nefarious intent in resurrecting the 1930's Optima band design and placing it on the 1990 Optima.

### Quality Of The Products

In determining this factor, "[t]he Court must consider whether the senior user's reputation could be jeopardized or tarnished by virtue of the fact that the junior user's product is of inferior quality." *Pfizer*, 2004 WL 896952, *6. Here, both products are of indisputably high quality, and there is little concern that the Montblanc name would be tarnished by any alleged affiliation with Aurora.

### Sophistication Of Consumers

The parties do not dispute that purchasers of high quality writing instruments such as the Montblanc Meisterstück and the Aurora Optima are very sophisticated.

---

**7.** Aurora's breach of the Settlement Agreement has no bearing on the bad faith inquiry. The Court's assessment of whether a powerful inference of actual confusion may be drawn is contingent on the junior user's bad faith in attempting to duplicate a registered mark. In this regard, the inquiry mirrors the "good faith" prong of the *Polaroid* test. Thus, the question is whether "the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir.1991).

Indeed, Montblanc avers that the people that own their pens are intelligent, sophisticated—a force to be reckoned with. The pens are very expensive, and the parties do not dispute that a consumer would never mistake a Meisterstück for an Optima.

***Applying The Factors.***

■ After considering the aforementioned factors, the Court finds that Montblanc has failed to establish any likelihood of source, post-sale, initial interest or subliminal confusion.

The Court finds no likelihood of source confusion because Montblanc has failed to establish that consumers perceive any endorsement or affiliation between Montblanc and Aurora because of the Refurbished Optima decoband. The two companies are direct competitors in the premium writing instrument market, and the consumers that purchase these quality pens are sophisticated enough to be aware that there is no affiliation between Aurora and Montblanc. Moreover, the three-ring decoband is relatively weak. The mere presence of a three-ring band design, while perhaps indicative of a quality pen, does not convey that a pen must be affiliated with Montblanc. (Tr. 248–29, 266–67, 291–94.)

■ Montblanc's allegations of post-sale confusion also fail. Montblanc's theory of post-sale confusion hinges on how consumers hold a pen, brandishing only its three-ring decoband. (Tr. 76–78, 265–66.) As an example, Montblanc provided a "still" photograph from the television program "Ally McBeal," in which the title character holds the Meisterstück horizontally, by its ends, so that only the decoband is displayed. (*See* Ex. 64.) The Court finds such a theory of confusion, entirely contingent upon how a person might hold their pen, tenuous at best. Moreover, the weakness of the three-ring decoband, the failure to adduce any evi-dence of actual post-sale confusion, and the differences in overall appearance between the two pens weighs against a likelihood of post-sale confusion. Importantly, Montblanc's pen expert, Joseph McElyea, testified that, based on the three rings alone, the average person would not be able to tell that a pen was a Montblanc. (Tr. 248–49, 266–67.) Rather, Mr. McElyea testified that the average person would simply recognize the pen "as a high quality pen." (Tr. 267.)

■ For similar reasons, the Court finds no likelihood of initial interest confusion. Having determined that the three-ring decoband is a relatively weak mark, the Court finds no likelihood that a consumer would be drawn to the Refurbished Optima solely because of its three-ring design. If anything, the evidence indicates that consumers are drawn to the Refurbished Optima's wide range of lively colors.

■ Finally, the Court finds no likelihood of subliminal confusion. The key inquiry concerning subliminal confusion is "whether the public is likely to be confused by the similarity of the marks as to the source of the goods." *See Playboy Enters., v. Chuckleberry Publ'g, Inc.,* 687 F.2d 563, 570 (2d Cir.1982) (quoting *Londontown Manufacturing Co. v. Cable Raincoat Co.,* 371 F.Supp. 1114, 1118 (S.D.N.Y.1974)). Here, the three-ring decoband is simply not a strong enough mark to resonate with consumers so as to create a likelihood that they will be drawn to the Refurbished Optima based on a subconscious association with Montblanc. Additionally, the marks, when viewed closely or in the context of the pens that bear them, are not similar enough to create a likelihood of such confusion.

### Trademark Dilution Under New York's General Business Law [8]

To establish a claim for trademark dilution under New York's general business law, a plaintiff must show: (1) ownership of a distinctive mark; and (2) a likelihood of dilution of the mark. *See* N.Y. Gen. Bus. L. § 360–*l*; *E–Z Bowz L.L.C. v. Prof. Prod. Research Co.*, No. 00–CV–8670, 2003 WL 22068573, at *34 (S.D.N.Y. Sept. 5, 2003). "Likelihood of confusion is not necessary to prevail on a state law dilution claim." *Pfizer*, 2004 WL 896952, at *8 (quoting *Fed. Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 175 (2d Cir.2000)).

The Court has already concluded that the three-ring mark is not inherently distinctive and is a relatively weak mark. The mark, however, is registered, and, therefore, has acquired some secondary meaning. Thus, the Court considers the likelihood of dilution.

Dilution can be established through either "blurring" or "tarnishment." *See N.Y. Stock Exch. v. N.Y., N.Y. Hotel, LLC*, 293 F.3d 550, 557–58 (2d Cir. 2002). Blurring refers to the dilution of a registered mark as a unique identifier of a particular brand. "The likelihood of blurring is generally assessed by a six-factor test: (1) similarity of the marks, (2) similarity of the products covered, (3) sophistication of the consumers, (4) predatory intent, (5) renown of the senior mark, and (6) renown of the junior mark." *Pfizer*, 2004 WL 896952, at *8. The Court has already addressed many of these criteria, and, for the reasons explained above, finds no likelihood of dilution.

Dilution by tarnishment occurs when a mark is 'linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context,' with the result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods.' *Hormel Foods Corp. v. Jim Henson Prod., Inc.*, 73 F.3d 497, 507 (2d Cir.1996) (quoting *Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39, 43 (2d Cir. 1994)). Because both products are of extremely high quality, and there are no allegations of unwholesome or unsavory use of the three-ring decoband marks, the Court finds no likelihood of dilution by tarnishment.

### Montblanc's Relief

Pursuant to its breach of contract claim, Montblanc seeks the following damages: (1) 150,000 DM for the consideration provided to Aurora to retool the Optima; (2) Aurora's profits from the sales of the 1990 Optima; (3) Aurora's profits from the sales of the Refurbished Optima; (4) prejudgment interest; and (5) costs and attorney's fees. (*See* Pls.' Statement of Claim for Relief at 2.)

In awarding damages for a breach of contract claim, a court's goal is to give the non-breaching party the benefit of their bargain. A court attempts to put the non-breaching party in as good a position as they "would have been in had the contract been performed, and no better." 3 Dobbs, *Law of Remedies* § 12.2 (2d Ed.1993); *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir.1995).

After reviewing the record, however, it is impossible for the Court to ascribe a value to the benefit Montblanc would have received if the Settlement Agreement had been performed. Mont-

---

**8.** Montblanc has withdrawn its federal trademark dilution claims pursuant to 15 U.S.C. § 1125.

blanc's primary evidence of damages consists of Aurora and Kenro's profits from the distribution of Optima pens. (Pls.' Proposed Findings of Fact and Conclusions of Law 16–20; Exs. 35, 54, 55, 65, 66.) Such evidence, while pertinent to measuring relief under the Lanham Act, *see* 15 U.S.C. § 1117(a), is not probative of the benefit that Montblanc would have received had the Settlement Agreement been performed. Rather, the appropriate inquiry concerning Montblanc's lost benefit would pertain to what profits *Montblanc* lost as a result of Aurora's breach. *See Schonfeld v. Hilliard,* 218 F.3d 164, 172 (2d Cir.2000) ("In an action for breach of contract, a plaintiff is entitled to recover lost profits ... if he can establish both the existence and amount of such damages with reasonable certainty."). Montblanc has failed to provide such evidence. There is no indication that, for every Refurbished Optima sold, Montblanc lost a Meisterstück sale. (Tr. 122–23.) And, based on the Court's factual findings and conclusions of law concerning the trademark claims, it is unlikely Montblanc would be able to establish such damages.

Notwithstanding the request for Aurora's profits, Montblanc argues that its benefit is "at least" the 150,000 DM paid to Aurora for the purposes of redesigning and retooling the Optima. Use of this figure, however, is not appropriate. Montblanc does not seek rescission and restitution, whereby such relief would be appropriate. *See* 26 *Williston on Contracts* § 68:2 (4th ed.2002). Indeed, the Settlement Agreement remains valid and enforceable, and Aurora is still bound to refurbish the Optima pens. Under these circumstances, Montblanc cannot be excused from its corresponding obligations.

In the absence of any proof of lost sales or any other evidence of lost benefit due to the breach of the Settlement Agreement, the only remedy available to Montblanc is nominal damages. *See Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926 (2d Cir.1977) ("When the existence of damage is uncertain or speculative, the plaintiff is limited to the recovery of nominal damages."); *see also* 24 *Williston on Contracts* § 64:6. Having found Aurora has breached the 1998 Settlement Agreement, the Court awards Montblanc nominal damages of $1.00 (One Dollar).

The Court reminds Aurora that the Settlement Agreement remains valid. While the Court finds no basis to award Plaintiffs attorney fees based on the instant facts, further violation of the Settlement Agreement may warrant such relief. *See Bass v. World Wrestling Fed.,* 129 F.Supp.2d 491, 510 (E.D.N.Y.2001) ("attorneys' fees and costs may be collected by a prevailing litigant in the court's discretion when there has been ... bad-faith misconduct").

## CONCLUSION

The Court RULES in favor of Plaintiffs on the breach of contract claim. Defendants are ORDERED to pay Plaintiffs nominal damages of $1.00 (One Dollar) and are further ORDERED to comply with the terms of the 1998 Settlement Agreement as revised September 15, 1998.

The Court DISMISSES Plaintiffs' trademark infringement, unfair competition, false designation of origin under the Lanham Act and New York common law.

The Court DISMISSES Plaintiffs' New York General Business Law trademark dilution claims.

The Court DISMISSES Defendants' breach of contract claims.

The Court directs the Clerk of the Court to enter judgment in favor of Plaintiffs and mark this matter as CLOSED. The Parties are directed to contact Mr. Charles

Baran, Courtroom Deputy to make arrangements for retrieval of all exhibits. If no arrangements have been made within thirty days of receipt of this Order, the exhibits will be discarded.

SO ORDERED.